### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF OHIO
### WESTERN DIVISION

**REBECCA HARPEL, et al.,**

    Plaintiffs,

    v.

**NSG GLASS NORTH AMERICA, INC., et al.,**

    Defendants.

CASE NO. 3:24 CV 1370

JUDGE JAMES R. KNEPP II

**MEMORANDUM OPINION AND ORDER**

### INTRODUCTION

Pending before the Court in this putative Fair Labor Standards Act ("FLSA") collective action is a Motion to Compel Discovery brought by Plaintiffs Rebecca Harpel, Lakesha McNary, and Marquis Short.[1] (Doc. 44); *see* 29 U.S.C. § 216(b). Defendants opposed (Doc. 45), and, in accordance with the Court's November 19, 2025, non-document Order, the Motion is fully decisional. Jurisdiction is proper under 28 U.S.C. § 1331. For the foregoing reasons, Plaintiffs' Motion to Compel Discovery is granted in part and denied in part.

### FACTUAL BACKGROUND

This case arises out of alleged labor rights violations at Defendants' various production facilities throughout Indiana, Kentucky, Michigan, and Ohio. *See* Doc. 13. Defendants' production facilities are part of the "world's leading suppliers of glass and glazing systems" and employ "several thousand" hourly workers like Plaintiffs. *Id.* at 6–7. Plaintiffs performed varying roles at Defendants' facilities across the region, ranging from a "quality lab technician" tasked with

---

1. In addition to the collective FLSA claim, Plaintiffs seek to pursue various state law claims as a class pursuant to Federal Civil Rule 23. (Doc. 13, at 40–47).

1

"inspecting coating of glass for defects" to a "materials handler" tasked with "retrieving orders from [a] warehouse" and "taking raw materials to the production line." *Id.* at 10.

Despite these varying roles, Plaintiffs claim entitlement to proceed as a collective under FLSA, alleging they are "similarly situated" with respect to all non-exempt hourly employees of Defendants, as "all were subjected to and injured by Defendants' unlawful practice of failing to pay overtime compensation for all hours worked in excess of forty (40) per workweek, and all have the same claims against Defendants for unpaid overtime compensation." *Id.* at 32. On Plaintiffs' account, Defendants failed to properly compensate for overtime worked due either to (1) a rounding system that undercounted Plaintiffs' total hours worked or (2) the decision to not include certain incentive and bonus payments in Plaintiffs' "regular rate of pay" which, in turn, is used to determine the hourly overtime rate owed. (Doc. 44, at 9).

### PROCEDURAL BACKGROUND

In advance of the initial Case Management Conference, the Parties indicated a desire to proceed with discovery targeted towards Plaintiffs' anticipated motion for court-facilitated notice of their FLSA collective action. *See* Doc. 35. The Court agreed and originally granted the parties 120 days to conduct discovery specifically related to the issue of whether Plaintiffs were "similarly situated" to those workers they sought to proceed on behalf of. *See* Doc. 36; 29 U.S.C. § 216(b). The Court twice extended the deadline to conduct such discovery, granting the parties roughly four months in addition to the original 120 days. Just 20 days prior to the second amended discovery deadline, Plaintiffs notified the Court of an apparently intractable discovery dispute between the Parties. *See* Doc. 39.

In their Notice of Discovery Dispute, Plaintiffs identified multiple categories of information Defendants refused to produce, including payroll and timekeeping data for potential

opt-in plaintiffs, contact information for the same, and information pertaining to Defendants' organizational structure. *See, e.g.*, *id.* at 6–7, 10–11, 18–19. On November 19, 2025, the Court conducted a discovery dispute conference to address these and other areas of conflict. At this conference, the Court granted the parties leave to file motions to compel discovery and issued multiple initial rulings on the record. First, the Court ruled Plaintiffs were entitled at this stage to discovery regarding Defendants' corporate structure, including "what entity owns each plant, who owns that entity, who owns that entity . . . all the way up." (Doc. 43, at 9). The Court explained Plaintiffs were entitled to see Defendants' "corporate and ownership structure from filings or organizational charts." *Id.* Second, the Court determined Plaintiffs were not presently entitled to discovery addressing past "complaints, administrative actions, audits, [or] court actions" regarding Defendants' wage and timekeeping policies. *Id.* at 12. Third, the Court ordered Defendants to produce unredacted employee handbooks for the plants at which Plaintiffs and potential opt-in plaintiffs worked. *Id.* at 15–16. Fourth, the Court ordered both Parties to produce all data in an Excel spreadsheet or in another form "readily formattable into an Excel spreadsheet." *Id.* at 25. Finally, the Court ordered both Parties to produce supplemental discovery responses by December 5, 2025, in light of its orders and guidance offered on the record. *See id.* at 23.

### LEGAL FRAMEWORK

Unlike a class action under Federal Civil Rule 23, a FLSA collective action "is more accurately described as a kind of mass action, in which aggrieved workers act as a collective of individual plaintiffs with individual cases." *Canaday v. Anthem Cos., Inc.*, 9 F.4th 392, 397 (6th Cir. 2021) (quoting *Campbell v. City of Los Angeles*, 903 F.3d 1090, 1105 (9th Cir. 2018)). In order to proceed as a collective, the plaintiffs who opt in must demonstrate to the Court they are

3

each "in fact 'similarly situated' to the original plaintiffs." *Clark v. A&L Homecare & Training Ctr., LLC*, 68 F.4th 1003, 1009 (6th Cir. 2023) (quoting 29 U.S.C. § 216(b)).

Prior to reaching a conclusive determination regarding whether the final opt-in plaintiffs are, in fact, similarly situated, the Court retains discretion to facilitate notice of the putative collective action to *potential* opt-in plaintiffs. *See Hoffmann-La Roche, Inc. v. Sperling*, 493 U.S. 165, 169 (1989). Tendering such notice to other employees of the pending putative collective action serves the goal of "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged" illegal employment practice. *Id.* at 170. To obtain notice, the plaintiffs must preliminarily demonstrate by a "strong likelihood"—"a showing greater than the one necessary to create a genuine issue of fact, but less than the one necessary to show a preponderance [of the evidence]"—they are similarly situated to the employees to whom notice will be sent. *Clark*, 68 F.4th at 1011.

In determining whether employees are "similarly situated" under 29 U.S.C. § 216(b), courts consider "(1) the factual and employment settings of the individual plaintiffs, (2) the different defenses to which the plaintiffs may be subject, and (3) the degree of fairness and procedural impact of certifying the action as a collective action." *Pierce v. Wyndham Vacation Resorts, Inc.*, 922 F.3d 741, 745 (6th Cir. 2019) (citation modified). Demonstrating a single, unified FLSA violation is not required for plaintiffs proceeding collectively to be similarly situated. *O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 585 (6th Cir. 2009), *abrogated on other grounds by Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016). Rather, where the plaintiffs can demonstrate their claims are "unified by common theories of [the] defendants' statutory violations, even if the proofs of these theories are inevitably individualized and distinct," the plaintiffs will be similarly situated with other employees. *Id.* "In general, employees are similarly situated when

4

they perform the same tasks and are subject to the same policies." *Arble v. East Ohio Gas Co.*, 2025 WL 3063235, at *2 (N.D. Ohio) (citing *Clark*, 68 F.4th at 1011).

Discovery of some scope and duration is often necessary to determine whether plaintiffs meet their burden under *Clark*, though courts ought to "expedite their decision to the extent practicable" and "waste no time in adjudicating" the notice determination. 68 F.4th at 1011. Thus, while Federal Civil Rule 26's mandate that any non-privileged, relevant, and proportional material is discoverable as a default matter may facially permit expansive discovery related to the notice inquiry, many courts within the Sixth Circuit require pre-notice discovery be "narrowly tailored."[2] *E.g.*, *Cordell v. Sugar Creek Packing Co.*, 691 F. Supp. 3d 838, 847 (S.D. Ohio 2023) (quoting *McElroy v. Fresh Mark, Inc.*, 2023 WL 4904065, at *9 (N.D. Ohio)). Though the Court does not explicitly adopt such a "narrowly tailored" standard here, it is ever cognizant of the risk that overly expansive discovery at this stage may serve "to create satellite litigation" and "delay resolution in a time-sensitive matter." *McCall v. Soft-Lite LLC*, 2023 WL 4904023, at *6 (N.D. Ohio).

### DISCUSSION

Plaintiffs Harpel, McNary, and Short timely filed their Motion to Compel Discovery targeting largely the same categories of information identified in their initial Notice. Specifically, Plaintiffs seek: (1) timekeeping and payroll data for all potential opt-in plaintiffs; (2) contact and identifying information for potential opt-in plaintiffs, i.e., the "FLSA Class List;" (3) business records pertaining to time rounding and regular rate of pay policies and practices; (4) detailed information regarding Defendants' organizational structure; and (5) responses to outstanding requests for admission. *See* Doc. 44, at 2. However, Plaintiffs do not offer significant substantive

---

2. Like *Clark's* adoption of the "strong likelihood" standard, this "narrowly tailored" standard governing the proper scope of discovery is plucked from the preliminary injunction context. *See Cordell*, 691 F. Supp. 3d at 848.

argument with their third category of information, and the portion of their brief addressing what specific classes of information to which they are entitled contains only four subsections, corresponding to the other four categories of information sought. *See id.*, at 10–16 (primarily offering substantive argument as to the "collective-wide timekeeping and corresponding pay data," the "FLSA class list," information pertaining to "corporate structure," and, finally, the outstanding "requests for admission" (capitalization altered)). Thus, the Court will similarly place its emphasis on these four categories of information identified by Plaintiffs, particularly where the Parties agree Defendants have already produced "complete and unredacted copies" of their employee handbooks for the relevant facilities and Plaintiffs do not explain whether such handbooks lack the desired payroll and timekeeping policies. *Id.* at 8.

Defendants generally counter that the information sought is outside the proper scope of discovery at this preliminary stage. Specifically, they claim "[t]he information Defendants have produced is more than sufficient for Plaintiffs to make their similarly situated argument." (Doc. 45, at 6). In fact, Defendants go as far as to suggest Plaintiffs seek the above categories of information not to effectively prosecute the case at hand, but instead to "drum up more litigation against Defendants." *Id.* at 13; *see id.* at 6. The Court considers each contested category of information in turn.

*Potential Opt-In Payroll & Timekeeping Data*

Plaintiffs first assert a right to obtain "collective-wide payroll and timekeeping data," specifically the "raw clock in/out data in Microsoft Excel format," the "rounded/ adjusted times from which Plaintiffs' compensable hours were recorded," the "policies governing [the] same," and "payroll data in Microsoft Excel format for the same scope of workers." (Doc. 44, at 10–11). At this time, Defendants have produced payroll data in Microsoft Excel format for the opt-in

Plaintiffs only.[3] *Id.* at 8. The group of potential opt-in plaintiffs, which the present Plaintiffs refer to as the "Putative FLSA Collective," for whom Plaintiffs seek discovery of this timekeeping and payroll information is undoubtedly broad. Plaintiffs define this group as:

> All current and former hourly manufacturing, production, and/or floor workers of Defendants from August 9, 2021 (i.e., three (3) years preceding filing of the Complaint on August 9, 2024) and continuing through the present whose payroll records reflect that they worked forty (40) or more hours in any workweek at any of Defendants' facilities and who, during any one workweek, (1) were not paid for all minutes or hours recorded in Defendants' timekeeping system due to any time editing and/or time rounding, and/or (2) received a productivity incentive payment, or other non-discretionary bonus, that was not included in the regular rate of pay when Defendants calculated overtime compensation.

*Id.* at 9. On Plaintiffs' account, the payroll and timekeeping information sought is, if not strictly necessary at this stage of the proceedings, then at least "highly relevant" to the *Clark* inquiry, as the data will demonstrate whether potential opt-ins "were not paid for all work hours/minutes prior to the scheduled 'start' and after the scheduled 'end' times of their shifts" as well as whether "certain bonuses/ incentive payments were non-discretionary" and thus subject to inclusion in the regular rate of pay. *Id.* at 10.

In opposition, Defendants primarily attempt to distinguish case law marshalled by Plaintiffs. *See* Doc. 45, at 10–13. In previous communications with the Court and Plaintiffs, Defendants maintained "line-by-line" payroll and timekeeping data for potential opt-in plaintiffs are "not really relevant to the similarly situated" analysis, as the focus is instead on whether the relevant employees were subject to the same payroll policies and performed the same job duties.

---

3. Plaintiffs state Defendants produced the relevant data for a "Shawn Foster" rather than the "Shaun Foster" who opted into this suit. (Doc. 44, at 8 n.2). Defendants do not reply to this contention. While the individual timekeeping and payroll data for one of over a dozen opt-ins are unlikely to be crucial at this pre-notice stage of discovery, Plaintiffs will undoubtedly be entitled to such information for each opt-in plaintiff prior to filing a motion addressing the final "similarly situated" inquiry.

(Doc. 43, at 6); *see* Doc. 39-3, at 5–6; *see also Clark*, 68 F.4th at 1010 ("Whether other employees are similarly situated for the purposes of joining an FLSA suit typically depends on whether they performed the same tasks and were subject to the same policies—as to both timekeeping and compensation—as the original Plaintiffs were.").

The Court agrees with Defendants that Plaintiffs' request for payroll and timekeeping data for the "Putative FLSA Collective" is overbroad at this stage of the case. Such detailed "line-by-line" information may well be both relevant and proportional in the post-notice discovery stage, when Plaintiffs will bear the burden to demonstrate each opt-in plaintiff who joins this suit "is in fact 'similarly situated' to the original plaintiffs." *Clark*, 68 F.4th at 1003; *see also Gudger v. CareCore Health, LLC*, 2025 WL 1311274, at *2 (S.D. Ohio) ("If the court decides that [n]amed Plaintiffs are similarly situated to the opt-ins by a preponderance of the evidence, the opt-ins become parties to the suit and can proceed collectively with [n]amed Plaintiffs to trial."). At that time, however, the scope of information relevant to this final similarly situated analysis will necessarily be bounded by the opt-ins who do, in fact, join this suit. Here, Plaintiffs seek detailed payroll and timekeeping data for an expansive set of *potential* opt-ins, which is all but guaranteed to be a significantly larger set of individuals than the group of actual opt-ins. The Court has little trouble concluding, at the very least, Plaintiffs are not presently entitled to a *greater* amount of information than they will be when shaping their final "similarly situated" argument after other plaintiffs have, in fact, opted in, particularly during what is meant to be an "expedite[d]" stage of these proceedings. *Clark*, 68 F.4th at 1011.

Perhaps providing such detailed information on a putative collective-wide basis may be proper and proportional with a narrower scope of potential opt-in plaintiffs. For example, Plaintiffs cite *Durbin v. Foundations Health Solutions, LLC*, in which another judge of this Court ordered

the defendants to produce "timekeeping and payroll records for [n]amed Plaintiff, the current opt-in plaintiffs, and the *Potential Plaintiffs* from November 22, 2019 to the present." 2023 WL 6383709, at *5 (N.D. Ohio). In *Durbin*, however, the court significantly *sua sponte* narrowed the definition of "potential plaintiffs" before granting this pre-notice discovery. The plaintiff in *Durbin* originally defined "potential plaintiffs" as all non-exempt employees who performed certain duties, "including but not limited to" six different employment positions. *Id.* at *5 n.5. The Court, indicating this definition was "open ended and provide[d] insufficient guidance to" the defendant, adjusted the definition to include "only those [six] types of professionals who [the plaintiff] has specifically named." *Id*. Here, however, Plaintiffs' definition of the "Putative FLSA Collective" is not readily subject to narrowing. Plaintiffs do not offer any job titles or categories of workers to which the production of detailed timekeeping and payroll data may be limited, as their present definition appears to cover essentially all of Defendants' hourly, non-exempt employees. *See* Doc. 45, at 14.

Nor are detailed payroll and timekeeping data regularly necessary to support a plaintiff's preliminary similarly situated showing under *Clark*. For example, another judge of this Court approved notice to potential opt-ins where the existing parties to the suit offered: (1) testimony from the named plaintiff and three existing opt-ins "regarding team meetings, pre-shift duties, and handoffs;" (2) testimony, along with paystubs for only one of the opt-in plaintiffs, indicating the employer "failed to include shift differentials and other bonuses in overtime calculations;" (3) evidence indicating the defendant maintained the same punch system and "pay-to-shift" policies for all hourly employees across its facilities; and (4) employee handbooks indicating all hourly employees were required to conduct certain work-related duties prior to the start of their shifts. *Balderas v. Norplas Indus., Inc.*, 2025 WL 2837584, at *3 (N.D. Ohio). According to the *Balderas*

court, such evidence "surpasse[d] 'bare allegations' and [was] sufficient to surpass the *Clark* threshold" as several district courts had "facilitated notice on similar or thinner records" post *Clark. Id.* (collecting cases). In one such example, the court facilitated notice to potential opt-in plaintiffs based solely on the sworn declarations of seven employees and the applicable employee handbooks. *See Gifford v. Northwood Healthcare Grp., LLC*, 2023 WL 5352509, at *4 (S.D. Ohio); *see also Gudger*, 2025 WL 1311274, at *3 (approving notice based on four declarations and the "[n]amed Plaintiffs['] . . . representative pay statements"). Thus, Plaintiffs' Motion to Compel Discovery is denied to the extent it pursues production of complete and detailed "timekeeping and payroll data for the potential FLSA collective" in Microsoft Excel format. (Doc. 44, at 10–11).

Plaintiffs resist this conclusion, warning the Court that Defendants' refusal to produce collective-wide timekeeping and payroll data at this stage is "designed to manufacture a future argument – namely, that Plaintiffs' evidentiary showing is insufficient – based on an informational deficit that Defendants themselves have created. . . . Defendants are effectively preventing Plaintiffs from developing the very evidentiary record the Court will need to assess the motion for notice." *Id.* at 11. However, to the extent Defendants argue the collective-wide data is not necessary for Plaintiffs to meet their burden under *Clark*, general principles of equitable estoppel would govern any subsequent attempt to argue the absence of such data forecloses the facilitation of notice. *See Browning v. Levy*, 283 F.3d 761, 776 (6th Cir. 2002) ("[J]udicial estoppel is utilized in order to preserve 'the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship.'" (quoting *Teledyne Indus., Inc. v. NLRB*, 911 F.2d 1214, 1218 (6th Cir. 1990))). Estoppel operates with particular force where: (1) a party adopts a litigation position clearly inconsistent with an earlier position; (2) this party successfully persuaded the court to accept its earlier position; and (3) accepting the subsequent inconsistent position would provide

the party with "an unfair advantage." *United States v. Hammon*, 277 F. App'x 560, 566 (6th Cir. 2008) (citing *In re Commonwealth Inst'l Sec., Inc.*, 349 F.3d 401, 406 (6th Cir. 2005)). Here, Defendants have persuaded this Court that "Plaintiffs do not need detailed payroll information for thousands of employees to make their similarly situated analysis." (Doc. 45, at 13). Any assertion to the contrary by Defendants after Plaintiffs move the Court to approve notice to potential opt-ins would likely provide Defendants with an unfair advantage. *See Hardy v. Square D Co.*, 199 F. Supp. 2d 676, 681 (N.D. Ohio 2002) (explaining a litigant may not "have its cake and eat it too").

Finally, Plaintiffs do not make clear to what extent Defendants have failed to produce the requested policies governing workday start and end times, clocking in and out, wages, bonuses, shift differentials, computation of work hours, "among other related policies/documents." (Doc. 44, at 10) (citing Request for Production[4] Nos. 8, 22, & 23); *see* Doc. 39-4, at 6, 10 (Defendants' responses to Plaintiffs' RFPs). Defendants responded to Plaintiffs' RFP Nos. 22 and 23, which requested all policies regarding "when the workday begins and ends for Plaintiffs" and "all clock-in, clock-out, and timekeeping policies that apply to Plaintiffs," respectively. (Doc. 39-4, at 10). Defendants' only objection offered as to these RFPs involved Plaintiffs' definition of "Plaintiffs," which included all potential opt-ins to this suit. *Id.* Plaintiffs do not explain in what manner Defendants' responsive productions are insufficient. Further, RFP No. 8 targeted "all documents and ESI" provided to Plaintiffs regarding their pay, timekeeping, break policies, overtime rates of pay, "or other terms of employment." *Id.* at 6. Defendants objected on broader grounds to this RFP, arguing it exceeded the proper scope of discovery under *Clark* and was not "proportional to the needs of the case." *Id.* Nevertheless, Defendants directed Plaintiffs to the same documents

---

4. Hereinafter "RFP."

11

referenced in response to RFP Nos. 22 & 23. *Id.* (citing Bates Nos. PILK000001-PILK000417); *see id.* at 10 (same). Plaintiffs again do not identify how these productions were insufficient.

At the November Discovery Dispute Conference addressing this matter, the Court told Plaintiffs

> I think [the Defendants have] given you, as I understand it, the policies and rules and handbooks . . . and, if I'm mistaken about that, you can correct me, but [the Defendants have] represented to me that they've done that. If that's true, I think that's enough at this juncture without past [legal] complaints and actions and so forth.

(Doc. 43, at 13). In reply, counsel for Plaintiffs stated "the [employee] handbooks are redacted in certain places, so we don't have a complete employee's handbook. We would appreciate being able to see that, but we understand the point in general." *Id.* Consistent with this Court's orders, *id.* at 15–16, Defendants have since produced complete and unredacted copies of the employee handbooks governing the relevant facilities, *see* Doc. 44, at 8. To the extent the official policies governing employee timekeeping, payroll, rate of pay calculation, work duties, and other material terms or conditions of employment are not contained within the employee handbooks, Defendants must produce them to Plaintiffs. Other employees will generally be similarly situated when they "performed the same tasks and were subject to the same policies—as to both timekeeping and compensation—as the original plaintiffs were." *Clark*, 68 F.4th at 1010. Therefore, Defendants must disclose all official policies governing employee pay, timekeeping, shift differentials, and any other term or condition of employment impacting "timekeeping and compensation" at Defendants' relevant facilities.

*Identifying Information for Potential Opt-Ins*

Next, Plaintiffs claim entitlement to the "FLSA Class List" in Microsoft Excel format, which they define as "contact information of all Putative FLSA Collective Members, including the

names, mailing addresses, email addresses, phone number(s), positions held, facilities worked, rate(s) of pay, and dates of employment during the relevant period (hereinafter the 'FLSA Class List')." (Doc. 44, at 13).[5] Defendants argue, particularly in light of the discovery they have already produced to this point, further producing contact information for "all employees who have worked at every facility operated by Defendants during the past five years" amounts to "in form or function . . . the solicitation of claims." (Doc. 45, at 13 (quoting *Clark*, 68 F.4th at 1010)).

Production of potential opt-in or collective-wide contact information is regularly endorsed by courts within the Sixth Circuit post-*Clark*. For example, in *Durbin*, the court ordered Defendants to produce "the names, dates of employment, location(s) of employment, last-known mailing addresses, mobile telephone numbers, and personal email addresses for all current and former hourly, non-exempt" employees who "worked 40 or more hours in any workweek" in roughly the preceding four years. 2023 WL 6383709, at *5. Similarly, in *McCall*, the court, while providing guidance regarding the permissible scope of discovery (as opposed to ruling on a motion to compel), stated the plaintiff was "at the very least . . . entitled to learn the identity (by name and contact information, and within the requisite statute of limitations) of other employees who are (or were) required . . . to perform the same categories of activities" described in the plaintiff's complaint. 2023 WL 4904023, at *9; *accord Jones v. Ferro Corp.*, 2023 WL 4456815, at *5 (N.D Ohio) ("[T]he Court agrees . . . that at least some discovery into the identities, job titles, and contact information of potential opt-in plaintiffs is warranted.").

None of these opinions suggest, much less hold, that production of such contact information would be rendered unnecessary conditional on the employer producing the "job

---

5. Here, "Putative FLSA Collective Members" encompasses the same definition adopted by Plaintiffs with respect to other categories of discovery. *See* Doc. 44, at 9.

descriptions and timekeeping and compensation policies" governing all of their employees, as Defendants now argue. (Doc. 45, at 14). Instead, the contact information of potential opt-ins is necessary because other employees "will usually have knowledge—sometimes unique knowledge—of the relevant facts" including whether they may be "subject to individualized defenses" and whether the merits of their claims, including whether the employer's policies caused similar FLSA violations, are "similar to the merits of the original plaintiffs' claims." *Clark*, 68 F.4th at 1010, 1012. That is, contact information for potential opt-ins is necessary not just to determine whether those employees are subject to the same policies as the original plaintiffs, but to preliminarily determine whether there is a strong likelihood the merits of the potential opt-ins claims with respect to those policies are sufficiently similar to the merits of the original plaintiffs' claims. Thus, Defendants' production of their pay and timekeeping policies, as well as the job descriptions of employees at the relevant facilities, does not negate the relevance of obtaining the contact information for potential opt-in plaintiffs.

Finally, Defendants do not contest, and the Court finds no reason to doubt, Plaintiffs' representation that Defendants' counsel, in an email to Plaintiffs' counsel, indicated that contact information for potential opt-ins would "probably not be hard to pull." (Doc. 44, at 15 n.7).

Accordingly, the Court grants Plaintiffs' Motion to Compel with respect to the "FLSA Class List" in Excel or equivalent format with the sole exception that Defendants need not produce the "rate(s) of pay" for all "Putative FLSA Collective" members. Such detailed information, which may be conditional on multiple different factors such as shift differentials, hours worked, holidays or other irregular days worked, pay incentives, etc., approaches the detailed "line-by-line" payroll data for potential opt-ins the Court previously determined is not properly discoverable at this stage.

14

*Defendants' Corporate & Organizational Structure*

Plaintiffs further seek information related to Defendants' corporate structure and details regarding the operation and oversight of Defendants' facilities. *See* Doc. 44, at 15–17 (specifically requesting full responses to Interrogatory Nos. 3 & 4 and RFPD No. 12). Plaintiffs maintain that, to comply with this Court's order directing Defendants to identify "what entity owns each plant, who owns that entity . . . all the way up," Defendants must "actually explain the integrated relationship" between the Defendants and their parent companies and other affiliated corporate entities within the "NSG Group." *Id.* at 16 (quoting Doc. 43, at 8–9). On Plaintiffs' account, such explanation requires Defendants to "produce actual organizational charts that identify the company officers and managers overseeing these facilities, as well as specific ownership interests and ownership-related documents. *Id.* (citing *Wesel v. Certus Healthcare Mgmt., LLC*, 2025 WL 1928081, at *3 (S.D. Ohio)). This information will, in turn, bolster Plaintiffs' allegations that Defendants operate as "joint employer[s]" of the workers within Plaintiffs' Putative FLSA Collective. *Id.* at 15.

In response to the Court's oral order at the November conference, Defendants produced a one-page chart providing an overview of their corporate ownership structure which, on their account, "provides the information this [C]ourt suggested Plaintiffs were entitled to at this stage in the litigation." *See* Doc. 45, at 16. The chart depicts Defendant NSG Glass North America, Inc., as what appears to be a wholly owned subsidiary of NSG Holding (Europe) Limited, which itself is a wholly owned subsidiary of Nippon Sheet Glass Co., Ltd. *Id.* Defendant Pilkington North America, Inc., is depicted as the last link in a long chain of entities which eventually lead back to Nippon Sheet Glass Co., Ltd. *Id.* Defendants' chart does not identify which entity owns each of Defendants' relevant operating facilities, though Defendants appear to have separately provided

15

this information to Plaintiffs prior to the filing of this Motion. *See* Doc. 39-7, at 2 ("These are two distinct corporate identities, and we've identified which one operates which plant. We've identified all production facilities operated by either Pilkington or NSG. You're welcome to make whatever arguments you'd like to the judge.").

It is axiomatic that employees must work for the same employer if they are, for purposes of FLSA, to be similarly situated with respect to the duties they perform and the policies to which they are subject.[6] In certain circumstances, however, two separate entities may be deemed "joint employers" of a given set of workers and subsequently be held "simultaneously responsible for FLSA obligations."[7] *Fegley v. Higgins*, 19 F.3d 1126, 1131 (6th Cir. 1994); s*ee also, e.g.*, *Farris v. Alliance Health Care Braeview, Inc.*, 2022 WL 504215, at *8–9 (N.D. Ohio); *Rojas v. First Pick Farms LLC*, 2026 WL 18617, at *18–20 (W.D. Mich). However, the standards governing the doctrine are unsettled, as "FLSA does not define 'joint employer,' nor has the Sixth Circuit 'explicitly identified a test for evaluating joint employment relationships in the context of FLSA claims.'" *Farris*, 2022 WL 504215, at *8 (quoting *Reyes-Trujillo*, 513 F. Supp. 3d at 779–80). To determine whether two entities are joint employers, then, courts routinely port over standards from other related employment contexts. *See, e.g.*, *Little v. Serv. Convenience, Inc.*, 2025 WL 3706411, at *2–3 (S.D. Ohio) (borrowing the Sixth Circuit's test for "joint employer" status from the Title VII context). Even then, a varying range of factors may be considered and afforded differing weight according to the context in which a given labor dispute arises. *See id.*, at *2; *Hay v. Cmty..*

---

6. *See* Orin S. Kerr, *A Theory of Law*, 16 Green Bag 2d 111 (2012).

7. Previously, the Department of Labor issued regulations purporting to interpret FLSA and the factors applicable to a "joint employer" analysis. *Reyes-Trujillo v. Four Star Greenhouse, Inc.*, 513 F. Supp. 3d 761, 779–82 (E.D. Mich. 2021) (tracing the relevant regulatory history). The Department of Labor repealed the relevant regulation in September 2021 and has not since substituted a similar regulatory provision. *See* 86 Fed. Reg. 40939–40 (July 30, 2021) ("rescind[ing] the final rule titled 'Joint Employer Status Under the Fair Labor Standards Act'").

*Health Sys., Inc.*, 2026 WL 75831, at \*25 (M.D. Tenn) ("Deciding whether joint employer status exists requires looking 'holistically . . . at the totality of the factors in the aggregate, rather than requiring satisfaction of all the factors.'" (quoting *Edmondson v. Nissan N. Am., Inc.*, 2024 WL 4635051, at \*10 (M.D. Tenn.))).

For present purposes, however, it is sufficient to identify the broader focus of the joint employer analysis and the information which may be relevant and proportional to that analysis. Generally, "joint employer status [will] exist when 'two or more employers exert significant control over the same employees—where from the evidence it can be show that they share or co-determine those matters governing essential terms and conditions of employment.'" *Hay*, 2026 WL 75831, at \*25 (quoting *Carrier Corp. v. NLRB*, 768 F.2d 778, 782 (6th Cir. 1985)). The essence of the analysis then is whether both entities and their agents retained the authority to control the others' workers in the performance of their duties, make hiring and firing decisions, alter their compensation and benefits, and discipline employees. *See EEOC v. Skanska USA Bldg., Inc.*, 550 F. App'x 253, 256 (6th Cir. 2013).

Under *Clark*, Plaintiffs must demonstrate a strong likelihood they share an employer or joint employers for there to be a strong likelihood they are similarly situated. Producing a single-page corporate ownership chart provides little to no guidance on whether Defendants operate as joint employers of Plaintiffs and potential opt-ins. Rather, what must be produced is information bearing on the day-to-day control over workers employed at each facility at issue in this case. Plaintiffs' RFP No. 12, which seeks "organizational charts, directories, lists, and other documents or ESI as will reveal, by name and position, Defendants' (and any of its related entities') officers, managers, and supervisors of Plaintiffs, as well as all personnel involved in human resources and/or compensation," is on point. (Doc. 39-4, at 7). This request targets information bearing on

17

who controls the day-to-day operations at each of Defendants' plants, as well as how those managerial agents fit into the Defendants' organizational structure, rendering it highly relevant to the joint employer inquiry. Of particular relevance to Plaintiffs' burden to demonstrate joint employer status will be the identities, roles, and positions of any managerial agents within Defendants' corporate structure (as represented in the "map" Defendants already produced) that either exert control over, or are simultaneously controlled by, multiple distinct corporate entities (and their agents) under the "NSG Group" umbrella. Similarly, Plaintiffs are entitled to discovery on any individuals who exercise general managerial control over each of Defendants' plants at issue in this case, including information identifying whether such individuals wield authority on behalf of multiple entities within the NSG Group.

To be clear, Plaintiffs are not entitled to information identifying and describing individuals who exercise general corporate control (such as corporate officers) within the NSG Group generally. Rather, discovery must be targeted towards those individuals who retain authority over the terms and conditions of employment and day-to-day operations at each of the relevant facilities, particularly if such individuals act on behalf of multiple entities within Defendants' corporate structure.

The Court thus grants Plaintiffs' Motion to Compel Discovery on Defendants' corporate and management structure as set forth herein. Defendants are to provide a supplemental response to Plaintiffs' RFP No. 12 consistent with this opinion's discussion of the standards governing the joint employer determination.

*Plaintiffs' Requests for Admission*

Finally, Plaintiffs seek an order requiring Defendants to fully answer 13 Requests for Admission.[8] (Doc. 44, at 16–18) (identifying RFA Nos. 6–18). These RFAs target information related to the inclusion of certain incentives into overtime pay generally, as well as specific information pertaining to named Plaintiff Rebecca Harpel's hours worked, base rate of pay, bonuses and incentives, and overtime pay. *See* Doc. 39-8, at 2–5. Defendants objected to each of these RFAs arguing they were "outside the scope of discovery to be conducted at this phase of the litigation, as set forth in the Court's Case Management Conference Order dated March 26, 2025," i.e., the order authorizing discovery consistent with *Clark*. *Id.* Now, Defendants further argue these RFAs were not "designed to elicit information Plaintiffs could use to argue there was a substantial likelihood that employees . . . would be similarly situated" with the original Plaintiffs, as they target only the "merits" of Plaintiffs' underlying FLSA claims. (Doc. 45, at 18–19).

Defendants' arguments are misplaced. As explained in *Clark*, "the very point of the 'similarly situated' inquiry is to determine whether the merits of other-employee claims would be similar to the merits of the original plaintiffs' claims." *Clark*, 68 F.4th at 1012. Plaintiffs' focus on the merits of the alleged FLSA violations is therefore unobjectionable, as their burden to demonstrate they are similarly situated with the potential opt-ins will necessarily require showing a similarity with respect to the merits of the alleged FLSA violations. Nor is it an issue, as Defendants suggest, that many of these RFAs "applied solely to Plaintiff Rebecca Harpel." (Doc. 45, at 18). It is commonplace for the original plaintiffs in FLSA actions to offer "representative examples" of alleged statutory violations in order to show they are similarly situated with other employees. These representative examples of FLSA-violating conduct, combined with

---

8. Hereinafter "RFA."

demonstrating other employees are subject to the same policies as the plaintiff offering the example, is a prototypical manner in which to demonstrate the employees are similarly situated. *See, e.g.*, *Gudger*, 2025 WL 1311274, at *3 (explaining "representative examples of miscalculated overtime" combined with the plaintiffs' declarations "support that the declarants were not properly paid overtime because of" the employer's pay and timekeeping practices and that such practices existed on a "company-wide" basis).

Thus, the Court grants Plaintiffs' Motion to Compel Discovery with respect to these RFAs, and orders Defendants to substantively respond to Plaintiffs' RFA Nos. 6–18, subject to the following exceptions. First, Defendants need only answer RFA No. 6 with respect to the named Plaintiffs in this action. Requiring Defendants to detail whether certain non-discretionary payments were included in workers' regular rates of pay on a putative-collective wide basis approaches the type of line-by-line payroll data the Court previously determined is outside the proper scope of discovery at this stage under *Clark*. Additionally, Defendants need not answer RFA No. 7 in its entirety. This RFA is largely circular, as it asks Defendants to admit that "one or more Plaintiffs . . . were not fully compensated for all overtime hours as a result of one or more pay policies and/or practices identified . . . in response to Representative Plaintiffs' interrogatories" without considering the possibility that Defendants, as they ultimately did, might deny the existence of any such policies in response to the preceding interrogatories. *See* Doc. 39-8, at 2.

**CONCLUSION**

For the foregoing reasons, good cause appearing, it is

ORDERED that Plaintiffs' Motion to Compel Discovery (Doc. 44) be, and the same hereby is, GRANTED IN PART and DENIED IN PART as set forth herein.

20

  s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE

Dated: March 11, 2026